2013 BNH 004

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW HAMPSHIRE**

In re:

                                                      Bk. No. 13-11075-BAH
                                                      Chapter 11

PM Cross, LLC,

        Debtor


*Peter N. Tamposi*
*The Tamposi Law Group*
*159 Main Street*
*Nashua, NH 03060*
*Attorney for the Debtor*

*Edmond J. Ford*
*Ford & Associates, P.A.*
*10 Pleasant Street, Suite 400*
*Portsmouth, NH 03801*
*Attorney for TD Bank, N.A.*


**<u>MEMORANDUM OPINION</u>**


**Introduction**

The Court has before it the Amended Motion to Dismiss (Doc. No. 39) and Amended

Motion for Relief from the Automatic Stay (Doc. No. 40) filed by creditor TD Bank, N.A. ("TD

Bank" or the "Bank"), as well as the Motion for Contempt for Willful Violation of the Automatic

Stay (Doc. No. 30) filed by PM Cross, LLC ("PM Cross" or the "Debtor").  By its twin motions,

TD Bank has asserted a number of claims, which boil down to two requests—for the Court to

find that the automatic stay did not arise upon the filing of the chapter 11 petition in this case, or,

if the stay was in effect, to grant retroactive relief; and for the Court to dismiss this case for cause

under section 1112(b) for a bad faith filing.  On the other hand, the Debtor denies the Bank's claims, asserts that the automatic stay did arise upon the filing of the petition, and asks the Court to hold TD Bank in contempt for continuing with and concluding its foreclosure sale after the Debtor had filed its bankruptcy petition.  The Debtor also asks the Court to award damages for "pre-petition" violations of the automatic stay.  After a period of limited discovery, the Court held an evidentiary hearing over the course of two days to determine the merits of the claims presented.  For the reasons set forth below, the Court finds that the facts in evidence indicate that: (1) the automatic stay was in effect when this case was filed but do not merit retroactive stay relief; (2) cause exists to dismiss this case; and (3) TD Bank did violate the automatic stay but, in the context of this case, its actions do not merit an award of damages.

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## Factual Background

*The Debtor*

PM Cross, is a limited liability company wholly-owned and managed by David McCurdy.  PM Cross owns a single parcel of real property, located at 15 Cross Road in Hooksett, New Hampshire (the "Property").  The Property is comprised of a single, 25,000 square-foot commercial building and surrounding land.  PM Cross exists solely to own and lease the Property.  The sole tenant of PM Cross is MTS Associates, LLC ("MTS"), another limited liability company which is also exclusively owned and managed by McCurdy.  MTS is in the business of selling and servicing golf carts and material-handling equipment, such as forklifts.  In order to finance its operations, the Debtor obtained financing from TD Bank in the principal

amount of $1 million (later increased to $1.045 million), in exchange for which the Debtor

granted the Bank a first mortgage on the Property.  McCurdy executed a personal guarantee on

this loan, the details of which are not in the record.  The Debtor also obtained financing from the

Small Business Administration (the "SBA") , in exchange for which the Debtor granted the SBA

a mortgage on the Property, junior to that held by TD Bank.[1]

*The First Bankruptcy Case*

The Debtor's troubles began when MTS' revenue declined due to a slowdown in the

golf industry.  These troubles came to a head in mid-November 2011 when, after MTS was

unable to pay its monthly rent to the Debtor for an extended period of time, the Debtor in turn

defaulted on its obligations to TD Bank.  In late December 2011, the Bank notified the Debtor

that it would be foreclosing on the Property.  On January 22, 2012, the day before the scheduled

foreclosure sale, the Debtor filed a voluntary chapter 11 petition (Case No. 12-10169-JMD).

The Debtor's only asset was the Property, valued on Schedule A at $1.25 million.  The

Debtor's Schedules indicated that it had only three creditors: TD Bank, the SBA, and the Town

of Hooksett.  TD Bank, the Debtor's largest creditor, was listed on the Debtor's Schedule D as

holding a $953,614.04 secured claim, and on Schedule F as holding a separate unsecured claim

of $291,693.56.  The SBA was listed on Schedule D as holding a claim of $820,497.78,

$296,385.96 of which was secured by its second mortgage, with the remaining $524,111.82

being unsecured.  The Town of Hooksett was scheduled as being owed $32,425.25 secured by

the Property.  At this time, the Debtor's only stream of income was  $14,500 per month from

leasing the Property to MTS.  See Schedule G.  This should have amounted to $174,000 per year,

---

[1] The original principal amount of this loan is not in the record.

but the Debtor's Statement of Financial Affairs indicated that the Debtor earned only $167,318 in 2009, $83,734 in 2010, and just $61,413 in 2011. Despite the discrepancy between what the Debtor's rent revenue should have been and the actual revenue shown on the Statement of Affairs, the Debtor stated that it had no rents or accounts receivable due (by checking "none" in the relevant portion of its Schedule B).

The Debtor's Amended Plan of Reorganization, dated August 24, 2012, was confirmed by order dated August 28, 2012 (Doc. No. 48) (the "Plan"). The Plan provided that TD Bank had a secured claim in the (apparently negotiated) amount of $1,117,637.91 which, subject to certain adjustments, would be amortized over a 20-year period but payable in full at the end of the fifth year. TD Bank voted in favor of the Plan. See Certificate of Vote (Doc. No. 47). Additionally, the Town of Hooksett—also voting in favor of the Plan—was to be paid in full, with 18% interest, over a two-year period. The SBA's claim, while initially scheduled as partially secured, was treated as wholly unsecured;[2] it was to receive a 1% distribution of $8,000, which the Debtor would pay in full by January 1, 2013. The Plan was to be funded by a $10,000 capital infusion from McCurdy[3] and the Debtor's income from renting the Property to MTS, which was to pay $7,681 per month. Section 6.1 of the Plan, which sets out the means for executing the Plan, stated that the Plan would also be funded by the rental income received from other tenants of the Debtor. It is unclear exactly who these tenants were, as various sections of the Plan are inconsistent on this point, and those sections conflict with the substance of the

---

[2] The record is devoid of explanation as to how the SBA's scheduled partially secured claim became wholly unsecured.

[3] Section VI.A of the disclosure statement, approved on July 10, 2012, stated that McCurdy would contribute $20,000 to fund the Plan. It is unclear when or why the amount changed.

disclosure statement.[4]  According to section 6.1 of the Plan, the Debtor had three tenants, MTS, Audley Construction, and Granite State Courier Service, and the rental income from those tenants would fund the Plan.  When section 6.1 is compared to section 8.1, which covers executory contracts and unexpired leases, the Plan refers to "R.S. Audley" not "Audley Construction," and does not mention Granite State Courier Service, while at the same time adding a tenant—Johnstone Enterprises LTD, whose business is described as "operating a courier service."  According to section 8.1 of the Plan, the Debtor was to receive $4,500 in total from tenants, above and beyond the rent received from MTS.  The Court finds that these discrepancies, while seemingly minor, are nonetheless relevant in the aggregate determination of whether the Debtor has used the bankruptcy process in bad faith.

Problems arose soon after the Plan was confirmed in late August 2012.  The first payments under the Plan, both to TD Bank and the Town of Hooksett, were due on October 1, 2012.  It is undisputed that the Debtor never made any Plan payments.  Instead, in early October, the Debtor, through McCurdy, began to make offers to the Bank to pay $1 million in full satisfaction of its mortgage, with the apparent goal of having the Debtor own the Property free of TD Bank's mortgage.  McCurdy testified that Louis Pichette had offered to finance this transaction.  Pichette is the owner of 5 Cross Road, a parcel of real property that abuts the Property, and an experienced real estate investor.  Pichette testified that McCurdy was well aware of his interest in purchasing the Property for $1 million, both during and after the first bankruptcy case.  And, McCurdy testified that he thought MTS would have a better chance of surviving if Pichette owned the Property or the mortgage on the Property.  It is unclear how long

---

[4] The disclosure statement indicated that two new tenants—R.S. Audley and Johnstone Enterprises, LTD—would be paying $1,500 and $3,000 per month, respectively, to the Debtor.  See Ex. 18, section III at 6.  Section VI.A of the disclosure statement, in discussing the financing of the Plan, does not refer to these tenants; only to MTS.

the Debtor's attempts to buy off the Bank persisted; what is clear is that TD Bank never accepted any of these offers. The Court takes note that it would have been difficult for the Debtor to make these overtures, for the amounts offered, if the SBA's second mortgage had remained on the Property. From this perspective, the first bankruptcy filing served the purpose of reducing the encumbrances on the Property to just over $1 million.

Despite the lack of any Plan payments and the ongoing dispute between the Debtor and the Bank, the Debtor filed a motion for final decree on October 17, 2012, averring that the Plan had been substantially consummated. No responses were filed, and the Court entered a final decree that same day (Doc. No. 79). The case was closed soon thereafter.

*The Second Bankruptcy Case*

On March 15, 2013, the Bank, still not having received a single payment under the Plan, sent a notice of foreclosure to the Debtor. The sale was scheduled for April 24, 2013, at 1:30 p.m. At this point, the Debtor began to engage in a course of conduct that was seemingly designed to limit or depress the price for which the Property would sell at the auction. The Debtor, who had been looking for new tenants, directed its real estate broker to vet any prospective lessees to ensure they were not just disguised potential foreclosure sale bidders trying to get access to the Property. A week before the sale, the Debtor hired a police detail to be present at the Property on the day of the auction and prevent anyone other than tenants from accessing the Property. Two days before the auction, on April 22, 2013, the Debtor signed and dated, but did not file, its completed, second bankruptcy petition.

Finally, McCurdy, on behalf of the Debtor, agreed to meet with Nick Mercier, a representative of MACY Industries, Inc.—an entity which was interested in acquiring the

Property at the upcoming foreclosure sale.  McCurdy and Mercier met on April 23, 2013, the

night before the foreclosure auction.  Mercier testified that he met with McCurdy to find out

about the financial troubles with PM Cross and MTS, as well as to do some due diligence with

regard to the upcoming auction.  McCurdy showed Mercier the Property and discussed

maintenance that had been deferred because of the Debtor's financial troubles.  Mercier

estimated that this maintenance would cost approximately $125,000 to $150,000.  McCurdy

advised Mercier that it would cost upwards of $300,000.  McCurdy also took the trouble to point

out that, if the Property was sold, he would be removing the costly evaporator unit, which he

described as integral to the use of the Property, and that MACY Industries would likely have to

purchase another evaporator unit, at its own expense.  Finally, Mercier testified that McCurdy

told him that it would really help McCurdy if Mercier did not go to the foreclosure auction.

McCurdy later testified that he was "joking" when he said this, but the Court is not persuaded by

that explanation.  When the whole of McCurdy's conduct is considered, it appears that he was

expressing his serious desire that Mercier not bid, or at least not be the winning bidder.

        The next morning, on April 24, 2013, the day of the auction, McCurdy again met with

Mercier, this time at the MACY Industries facility.  Mercier testified that the following exchange

took place:  McCurdy asked Mercier point blank how much he was intending to bid at the

auction.  When Mercier refused to tell him, McCurdy responded that he would have someone at

the auction bidding on the Debtor's behalf; that Mercier would not know who it was, and that

this individual would bid around $1 million for the Property.  McCurdy also stated that if the

price went over $1 million, he "had cards that he would play."  Mercier asked McCurdy if he

would file for bankruptcy.  McCurdy said that he had done it before and that "it wasn't a big

deal."  On the witness stand, McCurdy denied making these statements, but the Court does not credit this denial, given the course of events and McCurdy's general credibility as a witness.

The auction began later that day, at 1:30 p.m.[5]  It took place at the foot of the driveway entrance to the Property because the police detail, which the Debtor hired a week earlier, was carrying out the Debtor's instructions to restrict access to the Property.  There were approximately fifteen to twenty individuals present at the auction, including McCurdy, Pichette, and Mercier, as well as TD Bank's bankruptcy counsel.  The bidders were arrayed in a rough semi-circle facing the police cruiser, which was parked across the driveway.  The auctioneer—flanked by the Bank's attorney—was in the middle of this circle.  McCurdy stood off to one side and near the cruiser.  Once the auctioneer introduced the Property and announced the terms of the auction, the bidding began.

There were essentially only two major participants in the auction: Mercier and Pichette.  Each one bid, in the alternate, until the bidding reached around $1 million.  McCurdy appeared to be on his cell phone, still observing the auction.  The last bid Pichette made was for $1.05 million.  Mercier quickly eclipsed that offer by bidding $1.075 million.  At that point, it appeared that the price was too high for Pichette, as he began to shake his head and look down at the ground.  The auctioneer testified that he took those gestures to mean that Pichette was done bidding.  A few seconds after it became evident that Pichette would no longer bid, McCurdy—still on his cell phone—approached the auctioneer and said "I filed."[6]  McCurdy then approached TD Bank's attorney, who immediately took out his cell phone and appeared to make a call.

---

[5] The following details about the auction are derived from two videos, which were admitted into evidence, as well as the testimony of numerous witnesses.

[6] Although never explicitly stated, it appears from the testimony that both McCurdy and the auctioneer understood this meant that the Debtor had just "filed" a bankruptcy petition.

The auction did not stop and, in fact, after a short break it resumed and concluded with Mercier being the high-bidder for $1.075 million.  After the auction concluded, Mercier and TD Bank executed a memorandum of foreclosure sale.  See Ex. 46.  Paragraph 16, which the Bank's attorney added in hand-writing, states "Seller + Buyer acknowledge that the Borrower [the Debtor] filed a bankruptcy Petition.  Seller shall seek relief to complete the sale."  Thus, there is clear evidence that notwithstanding any possible or temporal ambiguity generated by McCurdy's "I filed" statement, the Bank knew before it signed the sale memorandum that the Debtor had filed;  and yet, the Bank nonetheless resumed its foreclosure by finishing the auction and signing the memorandum of foreclosure sale.

The Debtor filed its Schedules and Statement of Financial Affairs contemporaneously with the petition on April 24, 2013.  They are inconsistent in several important respects with the Debtor's projected performance under the Plan.  First, the Statement of Financial Affairs indicates that the Debtor had no income in 2012 or in 2013 year-to-date.  According to the Plan, the Debtor should have been paid monthly rent from MTS and at least $4,500 per month from other tenants.  But, as in the first chapter 11 case, the Debtor's Schedule B again states that the Debtor has no accounts receivable or rent due from MTS or the other two tenants.  In fact, the Debtor lists only one executory contract—the lease with MTS; the other tenants inconsistently named in the Plan are absent.  Other than those points, the Schedules show that the Debtor has the same three creditors and the same single asset (the Property) as in its previous case.  Importantly, Schedule A values the Property at $1,117,637.91—the valuation used in the Plan.

TD Bank quickly made efforts to live up to its promise in the foreclosure sale memorandum.  On April 26, 2013, it filed a motion for relief from the automatic stay, and a

motion to dismiss this case under section 1112(b).[7]  The motion for relief asserts five bases for relief.  First, TD Bank avers that the Debtor is a "small business debtor" as defined in section 101(51D), and that because this is the Debtor's second case filed within two years, the automatic stay is not in effect, pursuant to section 362(n).  Second, the Bank claims that the Debtor's filing was made in bad faith, that the automatic stay should be lifted under section 362(d)(1) for cause, and that the Debtor's bad faith merits the stay being lifted retroactively to the filing of the case.  As a corollary, the Bank also asserts that cause for stay relief exists because its interests are not adequately protected, as the Debtor is making no payments while interest and property taxes continue to accrue.  Third, the Bank claims that the Debtor has no equity in the Property, and that the Property is not necessary for an effective reorganization under section 362(d)(2).  Fourth, under section 362(d)(4), the Bank argues that the Debtor has filed this case as part of a scheme that involves multiple bankruptcy filings to delay, hinder, or defraud creditors.  Fifth, the Bank claims that under New Hampshire law the Debtor's right of redemption was extinguished the moment the foreclosure sale began and, consequently, the Property never became property of the estate under section 541, and thus is not subject to the automatic stay of section 362(a).

In its motion to dismiss under section 1112(b), TD Bank asserts a similar argument on a different statutory vector.  It argues that the case should be dismissed for cause as a bad faith filing.  The bad faith, the Bank would have it, stems from the Debtor's use of this bankruptcy filing in an attempt to retain control over the Property (and thus PM Cross and MTS), efforts which would have been impossible without the Plan having stripped off the SBA's second mortgage.  The U.S. Trustee joined in TD Bank's motion to dismiss on the grounds that no

---

[7] On May 15, 2013, the Bank amended its stay relief motion and motion to dismiss.  <u>See</u> Doc. Nos. 35 and 36.  The Court allowed these amendments at the evidentiary hearing.

payments had been made under the Plan, and that the Debtor was using this chapter 11 filing to alter impermissibly its obligations under the Plan.

The Debtor vehemently denies each of these claims. First, the Debtor asserts that the automatic stay took effect upon the filing of the case because this is not a small business debtor case under section 101(51C) and (51D). Second, the Debtor argues that this case was not filed in bad faith. Instead, it asserts that the Plan was unsuccessful for two reasons: (1) because TD Bank would not cooperate in drafting the modified notes required by the Plan, making performance of the Plan impossible; and because (2) Yamaha, one of MTS' major customers, defaulted on a critical contract and then caused other customers to default on their contracts with MTS—all of which drastically reduced the income of MTS, preventing it from paying rent to the Debtor. In addition, the Debtor separately moved to hold TD Bank in contempt of court for pre-petition conduct and for failing to halt the foreclosure sale after the Debtor filed this bankruptcy case and the automatic stay took effect.

The Court held an expedited preliminary hearing on the Bank's two motions and allowed a short period for discovery. During this period, on May 29, 2013, the Debtor filed amended schedules. These schedules amend the Debtor's asset values in several key ways. First, the Debtor lists $400,000 in accounts receivable on Schedule B-16 (up from "none" in its prior chapter 11 case). Second, the value of the Property has been increased on Schedule A to $1.4 million. Last, the Debtor lists a small amount of income—$23,043 from MTS—for the calendar year 2012.

As stated above, the evidentiary hearing took place over two days. At the conclusion of the hearing the Court took all matters under advisement.

11

**Discussion**

The Court will first address two aspects of the Bank's stay relief motion—whether the Property is property of the estate, and whether this case is a small business case in which the automatic stay does not arise.  TD Bank has argued that because the foreclosure sale commenced before the bankruptcy case was filed, under New Hampshire law, the Debtor lost its interest in the Property.  11 U.S.C. § 541(a)(1) provides that "the commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held . . . all legal and equitable interests of the debtor in property as of the commencement of the estate."  In Butner v. United States, the Supreme Court held that "property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. 48, 55 (1979).

In line with these principles, TD Bank argues that New Hampshire law, specifically N.H. Rev. Stat. § 479:18, has the effect of preventing the Property from becoming  property of the bankruptcy estate—at least on the facts presented.  Section 479:18 provides as follows:

> All lands conveyed in mortgage may be redeemed by the mortgagor, after the condition thereof is broken, by the payment of all demands and the performance of all things secured by the mortgage and the payment of all damages and costs sustained and incurred by reason of the nonperformance of its condition, or by a legal tender thereof, before foreclosure**.**

N.H. Rev. Stat. Ann. § 479:18 (West 2013).  The Bank asserts that because the Debtor did not exercise its right of redemption prior to the commencement of the foreclosure sale, it lost all interest in the Property so as to remove it from the purview of section 541(a)(1).  This is not the case.  The settled rule of law on point in New Hampshire is that the mortgagor loses both legal

12

and equitable interest in the encumbered property "once the auctioneer's hammer [falls] and the memorandum of sale [is] signed." Barrows v. Boles, 141 N.H. 382, 393 (1996). Indeed, the Barrows court cited with approval the decision of the court in In re Hazleton, 137 B.R. 560 (Bankr. D.N.H. 1992). In Hazleton, the court held that "a foreclosure sale conducted pre-petition terminates any Federal interest of the debtor in the foreclosed upon real property." Id. at 563. TD Bank argues that an incomplete foreclosure sale has the same legal effect as a foreclosure sale that was completed prepetition—an argument which is contrary to established case law and which this Court rejects. Because the auctioneer's proverbial hammer had not fallen at the Bank's foreclosure auction when this case commenced, the Property is property of the bankruptcy estate under section 541.

The Court will next address whether this case is a small business case in which the automatic stay does not arise. 11 U.S.C. § 101(51C) provides that "the term 'small business case' means a case filed under chapter 11 of this title in which the debtor is a small business debtor." The term "small business debtor" is defined in section 101(51D):

> a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning or operating real property or activities incidental thereto) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $2,490,925.

If a given case is a small business case and the debtor a small business debtor, then section 362(n) may prevent the automatic stay from arising; the automatic stay does not apply "in a case in which the debtor . . . was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition."

11 U.S.C § 362(n)(1)(B).  The parties do not dispute that the Debtor was involved in a prior case within the past two years in which a plan was confirmed.

However, the Debtor is not a small business debtor and, accordingly, this is not a small business case.  Both the Debtor's present and prior cases are "single asset real estate" cases.  The parties do not dispute that the debtor has only one asset: the Property.  The parties also do not dispute that the Property is "real property constituting a single property or project . . . which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto."  11 U.S.C. § 101(51B) (defining "single asset real estate").  By definition, a single asset real estate case cannot be a small business case.  The definition of small business debtor in section 101(51D) specifically excludes debtors in single asset real estate cases: "a person engaged in commercial or business activities . . . and excluding a person whose primary activity is the business of owning or operating real property or activities incidental thereto."  In other words, debtors in single asset cases are plainly excluded from the definition of small business debtor.  See 2-101 Collier on Bankruptcy P 101.51D (16th ed. Lexis 2013) ("The definition also does not include the Commission's recommendation that it include any single real estate debtor as that term was defined under former section 101(51B)"); see generally Lawton, "An Argument for Simplifying the Code's 'Small Business Debtor' Definition," 21 Am. Bankr. Inst. Law Rev. 55 (2013).  Accordingly, since the Debtor is not a small business Debtor and this case is not a small business case, the automatic stay of section 362(a) arose from the instant the bankruptcy petition was filed.

Next, the Court will reach the heart of the matter—whether this case was filed in bad faith and consequently whether it should be dismissed for cause under 11 U.S.C. § 1112(b).[8] Section 1112(b) provides that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause."  The section goes on to enumerate a list of factors, of which bad faith is not one.  The First Circuit, in In re Gonic Reality Trust, held that the list in section 1112(b) is not exclusive and that "the court may consider other factors as they arise and use its powers to reach appropriate results in individual cases."  909 F.2d 624, 626 (1st Cir. 1990).  In construing what other factors are relevant, the bankruptcy court must use its "sound judgment" and make its determination with the best interests of creditors as its highest goal.  Id. at 626-27.  This Court considers bad faith to be a factor relevant to whether cause exists to dismiss this case.  And, on the facts presented, the bad faith displayed by the Debtor would serve to undermine the purpose of the Bankruptcy Code, which is "to encourage financial restructuring and payment to creditors while preserving jobs and shareholder interests."  Id. at 627.

"There is a well-developed body of case law that holds that chapter 11 petitions can be dismissed for lack of good faith."  In re Sirius Sys. Inc., 112 B.R. 50, 51 (Bankr. D.N.H. 1990). Lack of good faith or a "bad faith filing in this context does not itself mean bad mind or malicious activity, or even fraudulent activity, but simply the causing of a reorganization proceeding to be filed that does not fit within the scope of chapter 11 relief."  In re Nesenkeag,

---

[8] The Court notes that the First Circuit has specifically not ruled on whether a bad faith filing is "cause" for dismissal under section 1112(b).  In re Capitol Food Corp. of Fields Corner, 490 F.3d 21, 24 (1st Cir. 2007).  Other circuits have held that the power to dismiss a case for a bad faith filing is not rooted in section 1112(b), but rather is a judicially developed doctrine, used to prevent abuse of the bankruptcy process. See, e.g., In re 1633 Broadway Mars Restaurant Corp., 388 B.R. 490, 498 (2d Cir. 2008).  This Court will analyze this case from the standpoint of whether cause for dismissal is present under section 1112(b).

Inc., 131 B.R. 246, 247 (Bankr. D.N.H. 1991).  Unless the parties proceed in good faith, "the balancing process between the interests of the debtor and creditors which characterizes so many provisions of the bankruptcy laws" will erode the legitimacy of "the delay and costs imposed upon parties to a bankruptcy."  In re C-TC 9th Ave. P'ship, 113 F.3d 1304, 1310 (2d Cir. 1997). In the analysis of whether a case has been filed in bad faith, courts have used an eight-factor test. If the factors are present in a case, the case may have been filed in bad faith, giving rise to "cause" for dismissal under section 1112(b).  See id. at 1311.  The eight factors[9] are as follows:

(1)    the debtor has only one asset;
(2)    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
(3)    the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
(4)    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
(6)    the debtor has little or no cash flow;
(7)    the debtor cannot meet current expenses, including the payment of personal property and real estate taxes;
(8)    the debtor has no employees

"Determining bad faith . . . requires a difficult distinction between permissible and impermissible motives.  Debtors often wish to shelter whatever assets they can from their creditors, and the Bankruptcy Code permits them to do so."  In re Kerr, 908 F.2d 400, 404 (8th Cir. 1990).  This is especially true in single asset real estate cases, where many of the factors can be present—even in the absence of bad faith.  Accordingly, courts must take special care in the analysis of "bad faith" in such cases.

---

[9] While "bad faith" is not a term explicitly contained in section 1112(b), it is nonetheless a factor in determining whether cause exists to dismiss a case.  The eight factors articulated in C-TC 9th Ave. P'ship are properly construed as sub-factors that may help a court determine whether bad faith exists at all.  Although CTC 9th Ave. P'ship is a case from a jurisdiction where dismissal for a bad faith filing is analyzed outside the rubric of section 1112(b), the Court nonetheless finds the CTC 9th Ave. P'ship factors germane in determining whether bad faith exists here.

In this case, after careful consideration of the facts in evidence, the Court determines both that each of the eight factors is present; and that the totality of the circumstances surrounding this case, including matters relating to the Debtor's prior case, indicate a true bad faith filing.

Factor 1 (single asset):  The parties do not dispute that the Debtor has only one asset, the Property.

Factor 2 (few unsecured creditors):  The Debtor has but one unsecured creditor, the SBA. TD Bank is owed the lion's share of the overall debt, in excess of $1.117 million compared to the SBA, which is owed an unsecured debt of $8,000, having been reduced to one percent of its original claim in the first case.

Factor 3 (foreclosure pending):  The Property is the subject of a foreclosure action by TD Bank.  The Court does not find that factors (1) through (3) are particularly determinative in and of themselves, but they become significant in the greater context.

Factor 4 (two-party dispute):  The dispute in this bankruptcy case is essentially a two-party dispute between the Debtor and TD Bank.  The Debtor's conduct and the testimony of its principal, David McCurdy, show this to be the case.  First, TD Bank is by far the largest creditor in this case.  In the prior bankruptcy case, TD Bank voted for the Plan.  After the confirmation of the Plan, the Debtor made no Plan payments to the Bank whatsoever, even after resolution of a short-lived dispute concerning the the loan documents required to be modified by the Plan. Instead, the Debtor chose to attempt to immediately renegotiate the Plan in an effort to maintain control of the Property at a discount, after the SBA's substantial second mortgage had been stripped off.  When the Bank refused the Debtor's offers and inevitably commenced its foreclosure, the Debtor filed for bankruptcy protection.  This sequence of events is all about the

17

Bank and the Debtor; the other parties are incidental players. The Town of Hooksett's secured real estate tax claim must be paid in its entirety under New Hampshire law, whether the Property is sold or retained, so virtually no matter how things pan out between the Debtor and the Bank, the Town will be paid. And, the SBA no longer has a secured claim.

The Debtor argues that this is not a two-party dispute, but rather, that the second filing was precipitated for two reasons. The Debtor avers the Bank would not cooperate in modifying the note, as required by the Plan, and so the Debtor could not make any payments. This argument is unavailing for several reasons. If what the Debtor says were true, the Debtor should have made payments to either the SBA or the Town of Hooksett, since the Debtor's obligations to those parties are not governed by the notes to the Bank. Next, McCurdy, the Debtor's principal, testified that TD Bank's conduct was in no way responsible for the second bankruptcy filing. Thus, the testimony of the Debtor's principal is directly at odds with its legal argument.

Finally, the Debtor asserts that the default of Yamaha, a customer of MTS, caused MTS to fail to pay rent to the Debtor, and that all of these events collectively resulted in the Debtor making no Plan payments. These assertions do not adequately explain or justify the Debtor's post-confirmation default, at least from the standpoint of an unanticipated change in circumstances. The disclosure statement that was approved in the prior case states, "MTS Associates has changed its business model to adapt to the changing business environment. This has included voluntarily surrendering its Yamaha golf car line when it became increasingly obvious that the fleet golf car market was not profitable enough to support the infrastructure need to service its territory." Ex. 18, at 6. By the Debtor's own assertion, revenue from Yamaha was no longer a factor in MTS' business. The Debtor never sought any relief from this Court during the pendency of the first chapter 11 case concerning its inability to make Plan payments. While

the record is far from clear on when substantial consummation of the Plan occurred, the first bankruptcy case was still open during the first two weeks of October 2012, when the Debtor began to fail to make good under the terms of the Plan.  If the Debtor could not make payments from the outset, and if the Plan had not yet been substantially consummated,[10] the Debtor could have sought a post-confirmation modification of the Plan under section 1127(b).  In sum, no evidence was presented that convinces the Court that Yamaha was an unanticipated material factor in the Debtor's failure to make Plan payments.  All the evidence points to a two-party dispute over Plan payments between the Debtor and TD Bank.

Factor 5 (timing of bankruptcy filing):  The Court had the opportunity to witness two video recordings of the foreclosure sale, and hear the testimony of numerous witnesses on the subject.  It is clear to the Court that the bankruptcy was precisely timed to avoid the Property being sold to the "wrong" party.  McCurdy admitted that he would have a representative bidding at the foreclosure sale and that if this representative was forced to bid over $1 million, he would "play his card," by which the Court infers he meant file another chapter 11 case.  It is apparent to the Court that the event that precipitated the filing of the bankruptcy petition was the failure of Pichette to outbid Mercier at the auction.  As soon as Pichette ceased bidding at just over $1 million, the Debtor filed its second bankruptcy petition.  Indeed, as stated above, Pichette and the Debtor had been negotiating unsuccessfully with TD Bank as early as October 2012 to purchase the Property for $1 million.

These facts fit too neatly together to be a coincidence.  McCurdy's stated reasons for filing when he did are not credible.  McCurdy testified that he filed after the foreclosure sale

---

[10] For purposes of the Plan, "substantial consummation" would likely have been "commencement of distribution under the plan" as defined in section 1101(2)(C), since none of the Debtor's property was being transferred, and the Debtor's management remained intact.

commenced because he was ambivalent about whether to file before the auction began. Once he made the decision, he testified that the Debtor's filing was motivated by (among other things) his concern for the tenants of MTS, and because he thought the Property was selling for too low a price, a price which would leave McCurdy personally liable for the deficiency to TD Bank. The Debtor did not allow anyone access to the Property before the sale, and attempted to dissuade Mercier from bidding. These actions are not consistent with someone who wants property to sell high. McCurdy admitted the Debtor's preferred bidder was Pichette. And Pichette, who according to McCurdy had virtually unfettered access to the Property, testified that he may not have retained the tenants in any event. The Court finds the Debtor's conduct at and during the foreclosure sale is evidence of an improper bankruptcy purpose, namely trying to maintain control of the Property, at the expense of a creditor, after failing to make a single demonstrable payment under a confirmed chapter 11 Plan for several months.

Factor 6 (cash flow): It is uncontested that the Debtor's Schedules indicate that it earned no income in 2013, that MTS is paying no rent; and that the Debtor presently has no other source of income.

Factor 7 (inability to meet current expenses): The parties have stipulated that the Debtor made no Plan payments to TD Bank, the Town of Hooksett, or the SBA, and the Debtor testified that this stems from an inability to make any Plan payments. Thus, it is clear the Debtor is unable to meet current its current expenses, which include real estate taxes.

Finally, Factor 8 (lack of employees): The Debtor has no employees. McCurdy, the Debtor's sole member and manager, runs its operations.

These eight factors, especially the circumstances associated with factors 4 (two-party dispute) and 5 (timing of filing), are indicative of a bad faith filing that is cause for dismissal. But the presence of the eight factors is not the only reason to dismiss this case as one filed in bad faith.  As referred to throughout, the Debtor has had a previous chapter 11 case (with a confirmed plan) pending in the past seven months.  "Where a debtor requests chapter 11 relief for a second time, the good faith inquiry must focus on whether the second petition was filed to contradict the initial bankruptcy proceedings."  In re 1633 Broadway Mars Restaurant Corp., 388 B.R. 490, 499 (Bankr. S.D.N.Y. 2008).  The analysis should focus on whether the Debtor has a "genuine need to reorganize," and an unforeseen change in circumstances must contribute to the Debtor's reasons for defaulting on its earlier confirmed plan.  Finally, the change in circumstances should be construed narrowly, in favor of leaving the first plan intact.  Id. at 500.

Here, the facts do not indicate any unforeseen change in circumstances.  The Debtor asserts that its failure under the Plan stems from the default of MTS' customer Yamaha and Yamaha's subsequent interference with MTS' other customer relationships.  As stated previously, the Court does not find this explanation credible and thus will discount it. Additionally, if the Debtor truly thought changed circumstances led to the second filing, it would have mentioned the loss of the other tenants (whether they were tenants of the Debtor or of MTS).  The complete absence of even a reference to them is striking.  Consequently, it does not appear that changed circumstances caused this filing.  Rather, this filing was made to countermand (or "contradict") a central provision of the Plan, namely that TD Bank would retain the mortgage on its collateral until it was paid in full according to the terms of the restructured notes.  The Debtor filed because it could not convince the Bank to sell or release its mortgage to the person preferred by the Debtor, Louis Pichette.  McCurdy testified that he believed there

21

would be a greater chance of MTS surviving if Pichette bought the Property, although Pichette

testified that he might not permit MTS to remain at the Property if it did not pay the rent that it

owed.  Thus, to that extent, the Debtor sought to retain the Property not to reorganize the Debtor,

but to keep intact a nondebtor entity (MTS) for the benefit of McCurdy, the equity-holder of both

the Debtor and MTS.  Accordingly for the reasons stated, sufficient cause exists to dismiss this

case under section 1112(b).

      The Court must now address whether the stay should be lifted retroactively in order to

validate the Bank's foreclosure sale.  TD Bank asserts that under the First Circuit's decision in

Soares v. Brockton Credit Union, 107 F.3d 969 (1st Cir. 1997), the automatic stay of section

362(a) should be lifted retroactively, given the Court's finding of bad faith.  The Court does not

agree.  TD Bank completed its foreclosure sale, despite full knowledge of the Debtor's

intervening bankruptcy filing.  There is no dispute on this point.  The court in Soares stated that

section 362(d) "permits bankruptcy courts to lift the automatic stay retroactively and thereby

validate actions which otherwise would be void."  107 F.3d at 976.  The court went on to explain

that there is no mechanical standard as to when retroactive relief is appropriate, but rather

unusual and unusually compelling circumstances must be present.  Such compelling

circumstances are not present here.  Were the Court to grant retroactive relief, it would

encourage other creditors to proceed as TD Bank did: continuing with a foreclosure sale, despite

knowledge of a bankruptcy filing, and hoping that the bankruptcy court would grant retroactive

relief.  This type of incentive is certainly less than compelling.  The Bank could have suspended

the foreclosure the minute the Debtor filed, and then sought relief.  It is unclear why the Bank

did not choose that course of action.  To the extent that the reason lies in the Bank's assertion

that the Debtor is a "small business debtor" as to whom the stay did not take effect in the second

case, the Bank knew enough about the Debtor's business from the first case to know that it was proceeding at its own risk, at best.[11]

The Debtor has also requested that TD Bank be held in contempt and assessed damages for its willful post-petition continuation of the foreclosure sale.   While the Bank did violate the automatic stay, the Court is not inclined to assess damages against it.  The Court has already determined that the Debtor should not have filed this bankruptcy petition, and thus the Debtor cannot argue that it suffered any kind of damages at the hands of the Bank.  The Court finds that the best remedy is to simply leave the parties in the position they were in when the case was filed.  The Court is not obligated to hold the Bank in contempt, even if its stay violation was willful.  Under analogous circumstances involving stay violations and a court's civil contempt powers, this Court has held that "the decision whether or not to award damages for contempt is discretionary." In re A & J Auto Sales, 210 B.R. 667, 671 (Bankr. D.N.H. 1997) (citations omitted) (finding the IRS willfully violated the automatic stay but declining to assess civil damages).

Finally, the Debtor asks the Court to hold the Bank in contempt and award it damages for the Bank's alleged pre-petition violations of the automatic stay.  This request is misplaced.  The automatic stay of section 362(a) does not apply to acts taken before the filing of a bankruptcy petition.

Given its decision on dismissal of this case, and its decision on retroactive relief from stay, the Court need not address the balance of TD Bank's motion for relief from stay.

---

[11] On the face of its chapter 11 petition in both cases, the Debtor affirmatively stated that the "Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D)." Bankruptcy Rule 1020(a) provides that "the status of the case as a small business case shall be in accordance with the debtor's statement under this subdivision, unless and until the court enters an order finding that the debtor's statement is incorrect."  No such order was sought or entered in the prior case.

**Conclusion**

For all the foregoing reasons, the Court finds that this case has been filed in bad faith and shall be dismissed accordingly.  Insufficient grounds exist in these circumstances to grant retroactive relief from the automatic stay, and given the procedural posture of this case, the Bank's actions do not merit a finding of contempt.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate order consistent with this opinion.


ENTERED at Manchester, New Hampshire.



Date:   June 21, 2013                    /s/ Bruce A. Harwood
                                         Bruce A. Harwood
                                         Chief Bankruptcy Judge